Filed 6/29/22  P. v. Rodriguez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSELINE VALERIE RODRIGUEZ,<br><br>Defendant and Appellant. | F081292<br><br>(Kern Super. Ct. No. BF174081A)<br><br>**OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Jennifer Oleska for Plaintiff and Respondent.

-ooOoo-

---

* Before Hill, P. J., Levy, J. and Detjen, J.

## INTRODUCTION

Appellant and defendant Joseline Valerie Rodriguez was charged and convicted of the first degree murder of Fidel Osorio, committed on October 9, 2018. Defendant had lived with Osorio in his trailer for two to three months prior to the murder. Defendant was arrested a few hours after the murder, and admitted she repeatedly hit him in the head with a metal pipe. She was sentenced to 25 years to life, plus one year for a personal use enhancement.

On appeal, defendant argues the court abused its discretion when it granted the prosecution's motion to introduce evidence that she had three prior convictions for domestic violence offenses, committed against another person, within the meaning of Evidence Code[1] section 1109. She further argues the court again abused its discretion by excluding evidence that Osorio had prior felony convictions, and that such evidence was admissible and relevant under section 1103 to show his violent nature.

We affirm.

## FACTS

Elena Bautista lived in a house on Florence Street in Lamont. There was a trailer parked on the back of the property. Ms. Bautista testified to her belief that at the time of the homicide, Fidel Osorio had lived in the trailer for a few years, and defendant Joseline Rodriguez had been living with Osorio for about one month.

Ms. Bautista saw defendant and Osorio together when things were fine between them, and that seemed "[l]ike an everyday thing." Ms. Bautista testified that she saw defendant and Osorio arguing one time, and defendant was yelling at him. She never saw defendant or Osorio place their hands on each other. Ms. Bautista usually chatted with defendant whenever they passed each other. On two or three occasions, defendant

___

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

2.

complained to Ms. Bautista about Osorio, and said that "he would touch her" sexually, and she did not like that.

Joviet Osorio Lopez was Osorio's niece and regularly visited Osorio at his trailer. Ms. Lopez thought defendant had been living with Osorio for about three months. Ms. Lopez frequently saw them together, and they seemed happy. Osorio bought clothes and food for defendant. Ms. Lopez often spoke with defendant, and she never complained about Osorio.

**Osorio meets Jimenez and Ferrer**

Jaime Jimenez described Osorio as a very good friend. He regularly visited Osorio at his trailer and met defendant several times.

On October 9, 2018, Jimenez met Osorio on the street, and they walked to a market and bought beer. Osorio invited Jimenez to his trailer to eat something, and Jimenez agreed.

Meliton Ferrer was at the same market that day. Ferrer did not know Osorio and Jimenez, but they started talking to him. Osorio invited Ferrer to join them at his trailer for something to eat. Ferrer liked them and agreed. Ferrer testified he drank one beer, and Osorio had three beers.

Osorio, Ferrer, and Jimenez left the market and walked together to Osorio's trailer. Before they reached the trailer, Osorio gave Jimenez some money and told him to buy a 12-pack of beer and meet them at the trailer. Jimenez headed to another market, and Osorio and Ferrer continued walking to the trailer.

**The homicide**

Ferrer testified that when he arrived at the trailer with Osorio, a woman, later identified as defendant, was waiting outside the trailer's door. Ferrer testified the woman was upset and the situation seemed "dangerous" because Osorio was "having problems with his partner." Osorio kept walking to the trailer, but Ferrer stopped before he got near defendant.

3.

Ferrer testified Osorio and defendant began arguing and pushing each other. Osorio "backed off," and defendant hit the top of Osorio's head with an object, "like with a bar." Ferrer testified defendant had the bar near her, ready to hit Osorio, when they were pushing each other.

Ferrer testified the blow split open Osorio's head and he started bleeding. Osorio fell to the ground and then got up. Osorio and defendant started grabbing each other again, and defendant still had the "bar." Ferrer could not understand what they were saying to each other because they spoke in English. Ferrer immediately left the area and walked home because he did not want to get involved in a problem between them.

In the meantime, Jimenez bought the 12-pack of beer and headed to Osorio's trailer. When Jimenez arrived, Osorio was "laid out" on the ground in the front of the trailer. Jimenez told Osorio to get up, but he did not move or respond. There was blood around Osorio's body.

Jimenez testified that defendant was outside the trailer, leaning on a "metal tube," and laughing. She told Jimenez to come into the yard. Jimenez testified that he did not get closer, and saw defendant hit Osorio with the metal tube twice: once in the throat, and once on his stomach. Jimenez thought Osorio was already dead when defendant hit him.

Jimenez turned around, left the trailer area, contacted a neighbor, and asked to borrow a telephone to call for help. Jimenez called the police because Osorio "had been beaten badly," and met the officers on the street when they arrived.

**Initial investigation**

At 2:22 p.m. on October 9, 2018, a call was placed to the 911 dispatcher to report a crime of violence at an address on Florence Street in Lamont. At 2:25 p.m., Kern County Sheriff's Deputy Wong responded to that location, spoke to people in front of a residence, and was directed to the trailer at the rear of the property.

4.

Deputy Wong found Osorio lying on the ground near the steps to the trailer. There was trauma and bleeding from Osorio's head, and blood was puddled in his mouth and under his head. Osorio was not moving but there was labored breathing, and Wong administered CPR. Emergency personnel responded, but Osorio was pronounced dead at the scene.

No one else was present in the area. A metal pipe was on the ground in front of the trailer, and there was possible blood on it. Detective Perez described the metal pipe as "sturdy" and "stiff," it was not "flimsy," and it was easy to pick up and move. The pipe was 21 inches long and weighed about a pound and a half.

Osorio's prescription medication and paperwork with defendant's name on it were found inside the trailer. There was a "DC" brand left shoe on the ground near Osorio, and the matching right shoe was found on his side; the shoes had possible blood stains.[2]

**The video cameras**

Ms. Bautista had motion detector security cameras installed inside her house. The cameras activated when someone entered the yard area between her house and the trailer, and she provided the video to the investigating officers. In viewing the video, she identified Osorio as he arrived at the trailer with an unknown man (Ferrer), and defendant when she left the area.

The security video was introduced at trial and played for the jury and is part of the instant appellate record. There were two video cameras in Ms. Bautista's house that filmed approximately the same area: the street, a driveway leading from the street to a building, presumably Ms. Bautista's house, and an area where the people on the video turned to their right and went out of the frame, presumably entering the yard where the

---

[2] In closing argument, the prosecutor speculated that defendant was wearing these shoes when she attacked Osorio and changed the bloody shoes before she left the scene.

5.

trailer was located. The trailer itself was not visible in the video, and defendant's assault on Osorio was not filmed.

The video exhibit showed that at approximately 1:59 p.m., Osorio and Ferrer walked from the street into the driveway, Osorio was in front of Ferrer, he turned to his right, and Ferrer followed him. They went out of frame, but a voice can briefly be heard. At 2:07 p.m., Ferrer emerged from the same side of the screen, walked away, and kept going down the street. At 2:12 p.m., Jimenez arrived, and he carried a shopping bag. He walked from the street, continued into the driveway, and also turned to his right side and went out of the frame. The video did not show Jimenez leaving; the People's trial brief stated that he left almost immediately.

At 2:14 p.m., defendant walked out of the same side of the frame where Osorio, Ferrer, and Jimenez had entered. She went down the driveway and walked down the street. At 2:26 p.m., officers arrived and walked into the driveway with their firearms drawn. Jimenez was standing in the background and pointing out the area to the officers. The officers entered that same right side and went out of the frame.

**The pathologist's testimony**

The pathologist testified Osorio had severe injuries to the face, hands, back, and abdominal area. There was blood all over Osorio's face and extensive injuries to his head. There were large lacerations predominately on the left upper part of his head and face and around his left eye, "[e]xtending diagonally across his upper head, the forehead, … a little bit of swelling, bruising around the left eye." The large lacerations measured from one and one-half to three and one-half inches long. There were abrasions and contusions under his left eye, nose, left side of his lip, and cheek, and a small laceration on his chin.

Osorio had open fractures on his head that were under the lacerations, meaning that there was "a laceration overlying the bone fracture itself, and so there's multiple comminuted fractures or multiple spiderweb-type pattern of fractures of the left side of

6.

the skull over the plate, the base of the skull and underlying those areas of the lacerations." On the back of Osorio's head, there were multiple lacerations and fractures under those lacerations, consistent with being inflicted by "significant impact" either by a blunt instrument or a significant fall.

Osorio had fractures above his left eye that extended all the way to the right ear, that resulted in subarachnoid hemorrhaging in the brain. The trauma caused blood vessels to break, and there was blood all over the brain. It would have required significant and severe force to inflict that type of bleeding in the brain.

Osorio also had major injuries on his back, consisting of multiple, diagonal, horizontal-type pattern injuries, in parallel lines "like a train track," consistent with being hit four or five times "with some round object, such as a pipe or a bat or other cylindrical-type objects." These blows resulted in deep muscle and soft tissue hemorrhages that also would have caused internal bleeding that leaked into the blood system and further damaged his body.

Osorio had defensive injuries consisting of significant and extensive bruising, and deep hemorrhaging, on the outside back of his right hand, consistent with being inflicted by blunt force trauma. There were no injuries to his neck.

The pathologist concluded the injuries to the front of Osorio's face and back of his head were inflicted from multiple blows "struck by multiple instruments—or by an instrument." Osorio was hit "[a]t least two times" in the front of his head, and "[a]t least three" serious blows by a blunt object to the back of his head, based on the separate nature of the serious lacerations. The contusions, abrasions, and bruises on his body were also caused by blunt trauma and were significant but not severe enough to cause death.

The pathologist testified Osorio died from "[m]ultiple blunt force traumatic head injuries" and died quickly after the infliction of the injuries. Osorio suffered from cirrhosis of the liver and had heart damage that might have increased the bleeding, but the head trauma would have been fatal without the underlying conditions.

7.

**Arrest of defendant**

Around 5:30 p.m., about two hours after Osorio's body was found, the deputies received information defendant was possibly at Weedpatch Supermarket, located near Osorio's trailer. Deputy Wong found defendant sitting in the market's parking lot. She was not injured and did not complain of any injuries. She was taken into custody without incident.

**Defendant's postarrest interview**

Kern County Sheriff's Detectives Perez and Meyer interviewed defendant after she was arrested. She was advised of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 and agreed to answer questions. The recorded interview was played for the jury and introduced into evidence.

Defendant, who was 27 years old, said she met Osorio the prior year while hanging out in Weedpatch. She had been living with Osorio at the trailer "for about two months now." When asked if she paid rent, defendant said she had not worked for two years, she received food stamps, and she planned to start working to "put in my part."

Defendant said Osorio talked about being her boyfriend, but she was not interested. Defendant would sleep on Osorio's bed, and occasionally he would sleep outside on the grass. Osorio told defendant that she should take care of him, and he would take care of her. He showed her that he kept a metal baseball bat in the trailer.

Defendant said that for the last couple of months, Osorio repeatedly attempted to have a sexual relationship with her nearly every day, but she refused and told him to stop. Osorio would get angry and call her names, and she told him to give her space. Defendant said she slept with Osorio only once, and that was "a few days ago."

Defendant said the prior evening, she stayed with Osorio at the trailer. She woke up in the morning, and she "was like laying sideways and I was straight up shaking all over the place and I turned and [Osorio] was sodomizing me." She closed her eyes and

8.

Osorio left.  Defendant said she previously gave permission to Osorio to sodomize her, and conceded the act was something Osorio would have "thought it was okay to do[.]"

Defendant said when she later woke up, Osorio had left the trailer.  Defendant said she left the trailer around noon while Osorio was still gone, and she never went back.

Detective Perez asked defendant if she knew why she was detained.  Defendant said she did not know, and thought it was because she was on probation for prior domestic violence convictions committed against another person, a female identified as M.J.[3]  Defendant said she had complied with the conditions of probation and stayed away from that person.  Perez asked about the prior incidents, and defendant said she did not feel comfortable talking about it.

The detectives asked defendant if she knew there was a security camera that showed the trailer area, and defendant said yes.  The detectives advised defendant that the video showed her leaving the trailer area at approximately 2:14 p.m. and not at noon, as she claimed.  Defendant thought the timer might have been off, and insisted Osorio left while she was asleep that morning, he never said anything to her, and she did not see Osorio before she left the trailer at noon.

Detective Meyer told defendant the video showed Osorio walked back to the trailer, defendant left at 2:14 p.m., and asked her what happened to Osorio.  Defendant asked if he was dead, and Detective Meyer said yes.  Detective Perez added, "More to the point, he's been murdered," and defendant replied, "I understand that."

The detectives asked defendant to be truthful about what happened.  Defendant insisted she did not know, and she never went back to the trailer after she left.  The detectives told defendant they were going to collect her DNA to compare it to the murder

_____

[3] As will be explained below, the court granted the prosecution's motion to introduce evidence of defendant's prior domestic violence convictions that involved a different victim, pursuant to section 1109.

9.

weapon, a metal bat, and again asked for her side of the story.[4] Defendant said the previous night, Osorio tried "to come on to [her]," and hit her in the arm. Defendant said he always pressured her for sex. The detectives said they could see a bruise on her arm.

Defendant said she had no idea where Osorio went or when he would return, but she was not trying to "run around the streets," and "I'm supposed to look for work or, you know, go to school or something." Detective Perez replied, "Well, you're young and he's not," and defendant agreed.

Defendant said that Osorio and a friend arrived at the trailer, and she did not know the friend's name. Defendant was outside and "meditating" when they got there, and Osorio "reeked" of alcohol. Osorio looked at her like he wanted to have sex, and defendant said not to touch her or put his hands on her. Defendant told Osorio's friend that Osorio had hit her, but the friend did not say much.[5]

Detective Meyer said the video showed Osorio's friend left a few minutes after they arrived, and asked defendant what happened after the friend left. Defendant said Osorio "started wrestling" and "using force" against her, he smelled of fecal matter, he said things that did not make sense, and he was delusional.

The detectives asked what she did with the metal pipe. Defendant said, "I don't know how to say it." Defendant was asked how many times she hit Osorio with the pipe. Defendant replied: "I don't know. I – I was f- fearful for my life.… [¶] … I don't know what he's gonna [*sic*] do if I woke up to him sodomizing me. I don't know what he'd – he'd do, he already and hit me and .…" Defendant believed she hit Osorio with the pipe "at least … ten or more" times on his head and back, and they were in the yard when this

---

[4] The murder weapon was not the metal baseball bat that defendant said Osorio kept in the trailer.

[5] Ferrer testified that he did not speak English and did not understand what defendant and Osorio said to each other.

10.

happened. She described the pipe as a "cylinder," and she held it on one end with both hands.

The detectives asked defendant to describe how she started to hit Osorio with the pipe. Defendant said she threw Osorio to the ground before she hit him with the pipe because he got in her personal space. Osorio threatened her, but he was slurring his words, and defendant could not give an example of what he said. Defendant said she grabbed the pipe after Osorio was on the ground, started hitting him, and "murdered" him. Detective Perez cautioned defendant that "we don't know it's murder yet."

Detective Perez asked defendant what happened after she hit Osorio with the pipe. Defendant said she "lost control" and was "[a] little bit" angry. Defendant said Osorio was bleeding from his head and making gurgling sounds, and she kept hitting him until he stopped moving. She stopped hitting him and fled the scene. She said she felt traumatized by what happened, and that Osorio "[f]orced" her to do it.

At the suggestion of the detectives, defendant agreed to write Osorio a letter. She wrote that she loved him even though they had their differences. She turned him down to have sex because she did not find him sexually attractive, "not would I be interested, but my situation is I'm homeless and out on the street." She "choked" and could not handle the pressure of sleeping with him. Defendant wrote that she had her needs too, and she "gave [him] some action because [she] did enjoy [his] company." Defendant "grew to develop love" for him and "found shelter" at his home, and but felt under pressure when he approached her, apologized, and wrote that she "messed up."

After the interview, the detectives took a photograph of defendant that showed "an injury of some sort on her arm" that looked like "some sort of bruise" or "red mark," but the skin was not torn.

**Stipulations**

As will be discussed further in issue I below, the jury was advised that the parties stipulated that defendant had two prior misdemeanor convictions under Penal Code

11.

section 243, subdivision (e)(1), and one prior felony conviction under Penal Code section 273.5, subdivision (a).

**Defense**

Defendant did not testify.

Detective Chambliss was called by the defense and testified that he initially interviewed Jimenez in front of the residence on Florence Street. Jimenez had red, watery eyes and smelled of alcohol. Later that day, Chambliss conducted a recorded interview with Jimenez with the assistance of an interpreter, and the defense introduced the recording into evidence.

In the recorded interview, Jimenez stated that when he arrived at the trailer, Osorio was lying on the ground, unconscious, and "bathed in blood." Defendant was standing next to Osorio and holding "a stick of iron," that he thought was a skinny metal fence pole. She did not say anything. Jimenez said defendant looked both "fine" and "upset." She did not move, and he did not see defendant hit Osorio.[6] Jimenez left and asked a neighbor for a telephone to call for help. Jimenez identified defendant from a photographic lineup as the suspect.

## PROCEDURAL BACKGROUND

On August 26, 2019, an information was filed in the Superior Court of Kern County charging defendant with count 1, first degree premeditated murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)), with the special allegation that she personally used a deadly or dangerous weapon, a metal pipe, in the commission of the offense (Pen. Code, § 12022, subd. (b)(1)).

---

[6] At trial, Jimenez testified that when he arrived at the trailer, Osorio was on the ground and not moving, and he saw defendant hit him with the pipe in the throat and stomach. The pathologist testified he did not find any trauma or injuries on Osorio's throat.

12.

**Jury trial and instructions**

On March 4, 2020, defendant's jury trial began with the prosecution's case-in-chief.

The jury was instructed with CALCRIM No. 505 on justifiable homicide and lawful self-defense; CALCRIM Nos. 520 and 521 on first degree premeditated murder, second degree murder, and express and implied malice; and CALCRIM Nos. 3471 and 3474 on the right to self-defense after mutual combat, and that self-defense may not be contrived.

The jury was also instructed with CALCRIM Nos. 570 and 571 on the lesser offense of voluntary manslaughter based on sudden quarrel or heat of passion, and voluntary manslaughter based on imperfect self-defense.

**Verdict and sentence**

On March 12, 2020, defendant was convicted of first degree premeditated murder, and the personal use enhancement was found true.

On June 2, 2020, defendant was sentenced to 25 years to life plus one year for the personal use enhancement; the court revoked probation in another case and imposed a concurrent midterm of three years.

On the same day, defendant filed a notice of appeal.

## DISCUSSION

### I.    Admission of Defendant's Prior Convictions of Domestic Violence

Defendant contends the court improperly granted the prosecution's motion to introduce evidence of her three prior convictions for domestic violence that she committed against another person, because defendant and Osorio were not "cohabitants" as defined by section 1109, the prior convictions did not show a pattern of abusive conduct, and the evidence was unduly prejudicial.

## A. *Section 1109*

We begin with the provisions of section 1109. "Ordinarily, propensity evidence – evidence that a defendant committed an uncharged offense – is inadmissible to prove the defendant's disposition to commit the charged offense. (§ 1101, subd. (a).) Evidence that the defendant committed uncharged crimes or other acts, however, is admissible to prove relevant facts other than disposition, such as motive, intent, and absence of mistake or accident. (§ 1101, subd. (b).)" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531 (*Kerley*).)

"The Legislature … has carved out specific exceptions to this general rule in cases involving domestic violence, elder abuse, and child abuse (§ 1109) and cases involving sexual offenses (§ 1108). Section 1109 provides, in relevant part, 'in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.' (§ 1109, subd. (a)(1).) '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' [Citation.] As a result, section 1109 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' [Citation.] Section 1109 'reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation.' " (*Kerley, supra*, 23 Cal.App.5th at p. 531.)

"[S]ection 1109 expressly incorporates the limitations of section 352. Therefore, before admitting evidence under section 1109, the trial court must exercise its discretion to determine whether the probative value of the evidence is 'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or

14.

(b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (§ 352.) [¶] '[U]ndue prejudice,' as used in section 352, however, does not mean evidence that is harmful to the defendant's case. ' " ' "[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " ' " (*Kerley, supra*, 23 Cal.App.5th at p. 532.)

"The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.' [Citation.] The record must affirmatively show that the trial judge did in fact weigh prejudice against probative value, but no more is required. [Citation.] We review the trial court's exercise of discretion in admitting evidence under section 352 for abuse and will not disturb the court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)

With this background in mind, we turn to the evidence introduced in this case.

**B.      *The Prosecution's Motion***

The prosecutor moved to introduce evidence that defendant had three prior convictions for domestic violence offenses, and argued the evidence was relevant pursuant to section 1109. The convictions were for violation of Penal Code section 273.5, willful infliction of corporal injury resulting in a traumatic condition, on January 12, 2018; and two convictions for violating Penal Code section 243, subdivision (e)(1),

battery, on January 12 and May 4, 2018. The victim in the three offenses was a female identified as M.J.; Osorio was not involved in the prior offenses.

The prosecutor's trial brief stated the following facts about defendant's prior convictions:

"On August 2, 2017[,] defendant had been in a dating relationship with female [M.J.] born in 1966 for approximately two years. The two were living together but [M.J.] told defendant she needed to move out but could stay for a couple of days. They were in the bedroom as defendant was trying to talk to [M.J.] but was being ignored. Defendant grabbed [M.J.'s] face and told her to look at her, [M.J.] was able to push defendant off of her and an oral argument ensued.

"On August 3, 2017[,] an argument ensued, and defendant again grabbed [M.J.'s] face and told her to listen to her. [M.J.] was unable to push defendant away and attempted to swing a cane at her, but defendant took the cane. Defendant then pinned [M.J.] down and shoved a cucumber into her mouth. After a few minutes she stopped shoving the cucumber into her mouth and punched her in the right eye and then started poking her (including the vaginal area) and drawing on her with a pen. [M.J.] was able to escape when a food delivery person knocked on the door."

At the hearing on the motion, the prosecutor argued the prior domestic violence convictions were highly probative under section 1109 because the evidence showed defendant's propensity for violence in her relationships and conduct, and the evidence not unduly prejudicial since the prior acts were less severe than the charged offense of murder. The prosecutor offered to sanitize the prior convictions by only introducing documentary evidence or reaching a stipulation.

The prosecutor further argued defendant and Osorio were cohabitants as defined by section 1109 and statutes cited therein, because defendant admitted in her pretrial statement that she had lived with Osorio for two months, she planned to start working to contribute to their expenses, and she admitted having sexual relations with Osorio.

Defense counsel argued the prior convictions were inadmissible under section 1109 because defendant was not a "cohabitant" as defined by statute since she only lived

16.

at Osorio's trailer for a short period of time, she may not have slept there every night, and there was no evidence of the permanency of their relationship.

Defense counsel did not challenge the factual basis for the prior convictions stated in the prosecution's trial brief but argued defendant's three prior convictions were not relevant because they involved a different victim than Osorio, the evidence was insufficient to establish a pattern or propensity, there was no evidence that defendant inflicted any serious injuries in the prior offenses, and the prior acts would be unduly prejudicial.

Defense counsel also moved to exclude evidence that defendant was on probation for these prior offenses at the time of the homicide.

## C.    *The Trial Court's Ruling*

After hearing the parties' arguments, the court granted the prosecution's motion to admit defendant's three prior domestic violence convictions pursuant to section 1109, and found defendant and Osorio were cohabitants:

> "The Court finds the current offense involves domestic violence, in that there was sexual relations between the parties while sharing living quarters, the joint use of property or cohabitants of property when harassment, threats, and/or sexual assault occurred, and all the above occurred within the last five years.

> "The sexual contact between the defendant and the victim, though infrequent, and the victim's romantic feelings for the defendant, though unreturned, show an intimacy going well beyond ordinary roommates.

> "… Section 352 analysis here regarding probative value versus prejudicial effect is as follows:  The prior acts of domestic violence demonstrate the defendant's propensity to be in violent relationships. This would be relevant in this case because the defendant states she did not like [Osorio's] sexual advances.  Other than the defendant's own statement, there is no other evidence to support her claim that she had to ward off his sexual advances in this matter.  Her prior acts of domestic violence tend to demonstrate her propensity to commit such crimes.

17.

"In addition, documents will be used in lieu of live witnesses and will not nearly evoke an emotional response or bias as that of live witnesses discussing specific facts of a prior incident."

The court also found defendant's three prior convictions were offenses of moral turpitude and were admissible to impeach her possible trial testimony. Defense counsel withdrew his objection to admission of defendant's probation status based on those same three convictions.

## D.     *Trial Evidence and Instruction*

As set forth above, defendant did not testify.

The evidence about defendant's prior domestic violence conviction was introduced through a stipulation to the jury that defendant had two prior misdemeanor convictions under Penal Code section 243, subdivision (e)(1), and one prior felony conviction under Penal Code section 273.5, subdivision (a). The court's stipulation further advised the jury:

> "A conviction for a violation of … [Penal Code] Section 273.5 requires proof that the defendant willfully inflicted a physical injury on the defendant's cohabitant or former cohabitant and the jury inflicted by the defendant resulted in a traumatic condition. A traumatic condition is a wound or other bodily injury, whether minor or serious, caused by the direct application of physical force. [¶] … A conviction for a violation of … [Penal Code] Section 243, subdivision (e)(1), requires proof that the defendant willfully touched the defendant's cohabitant or former cohabitant in a harmful or offensive manner."

The jury received CALCRIM No. 852A, evidence of uncharged domestic violence.

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case. Specifically, one, a felony, PC 273.5, on or about January 12th, 2018 … [¶] Two, misdemeanor Penal Code Section 243(e)(1) on or about 1/12/18 … [¶] Number three, misdemeanor Penal Code Section 243(e)(1), on or about May 4, 2018 …
>
> "The People and the defense have stipulated that the defendant was convicted of these offenses. If you decide that the defendant committed the

18.

uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit, and did commit, murder as charged here.

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider, along with all the other evidence. [¶] It is not sufficient by itself to prove that the defendant is guilty of murder. [¶] The People must still prove each charge and allegation beyond a reasonable doubt. Do not consider this evidence for any other purpose."

### E.    *Closing Arguments*

In closing argument, the prosecutor addressed defendant's prior domestic violence convictions, argued defendant was mad at Osorio "[p]robably over the sex thing," and suggested the jury should "look at her history" and "the person we're talking about."

"She's not a person who's going to act reasonably all the time because she has a history of violence. And these are convictions. This isn't just events that happened. These are actual criminal convictions for violence. [¶] She had a misdemeanor in 2017. That's the offense date, not the conviction date. August of 2017 she had a felony. And, again, in April of 2018, just a few months before this, she had another misdemeanor for violence. [¶] So she reacts to situations. Where most people wouldn't, she reacts violently. [¶] And thanks to instruction [CALCRIM No.] 852A, you may conclude that the defendant was likely to commit murder because of her past."

The prosecutor argued the jury could consider defendant's prior convictions to conclude she was likely to commit murder, in light of the other circumstances, because she had a violent history.

"Domestic violence has an ugly, ugly past … [and] becomes a pattern over and over and over. It can go on for years until the couple either separates or they get the help they need to fix it, and [defendant] is someone that has been in a domestic violence relationship with violence before and here she comes with [Osorio] and she's in a domestic violence relationship with [Osorio] again, and she is the aggressor in both."

In his closing argument, defense counsel argued defendant was not guilty based on lawful self-defense because she reasonably feared being raped or forcibly sodomized. In

19.

the alternative, counsel argued she was only guilty of voluntary manslaughter based on imperfect self-defense. Defense counsel acknowledged defendant had prior convictions for domestic violence but reminded the jury to also consider Osorio's prior threats to defendant, he regularly pressured her to have sex, and he hit her and performed an act of sodomy the night before the homicide. Counsel asserted that when Osorio arrived at the trailer, defendant argued with him, Osorio came at her, and defendant reasonably feared for her life. Defendant believed she had to defend herself because Osorio arrived with an unknown man, and she had been through Osorio's past and current harm and threats.

Defense counsel clarified defendant's prior convictions did not involve Osorio:

> "As for the prior domestic violence convictions, yes, the law says you're allowed to take those into consideration, but it doesn't say that … you can rely solely on that to conclude that she's guilty of … the charge in this case and the lesser-included offenses. [¶] It may have some more value if these were prior offenses that had to do with Mr. Osorio, but these aren't. They didn't have anything to do with Mr. Osorio. They were totally separate. Two of them were misdemeanor convictions which don't require proof of any injury.

> "One was a felony which requires only proof of what's called a traumatic condition, which can be a minor injury. Nothing similar to here where we're trying to make it look like she's really this violent person that's reacting in these ways. That's actually—there's no assault with a deadly weapon, any use of a weapon alleged in these, or any allegations that she actually inflicted any kind of significant harm."

In rebuttal, the prosecutor responded to defense counsel's characterization of defendant's prior convictions:

> "[Defense counsel] tried to tell you that, 'Oh prior DV is—is not important here because it happened with someone else.' It's more important because it tells you it's not a misunderstanding between two people. This is a person violent with one person and another. So we know it's not the partners. It's her. That's very telling."

20.

**F.** *Cohabitants*

On appeal, defendant first asserts the court abused its discretion by admitting the prior domestic violence convictions because defendant and Osorio were not "cohabitants" as that term is defined by section 1109, so that her prior domestic violence convictions were inadmissible.

As previously stated, section 1109 provides, in relevant part, that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).)

Section 1109 defines "domestic violence" and "cohabitants" by reference to two different statutes: "'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, *'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense*." (§ 1109, subd. (d)(3), italics added.)

Under the definition set forth in Penal Code section 13700, domestic violence is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another" (*id.*, subd. (a)), that is "committed against an adult or a minor who is a spouse, former spouse, *cohabitant, former cohabitant*, or person with whom the suspect has had a child *or is having or has had a dating or engagement relationship.... '[C]ohabitant' means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship.* Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties hold

21.

themselves out as spouses, (5) the continuity of the relationship, and (6) the length of the relationship" (*id.*, subd. (b), italics added).

Section 1109's alternate definition is contained in Family Code section 6211, that "defines domestic violence more broadly" and is subject to section 1109's limitation that the acts must have occurred no more than five years before the charged offense. (*People v. Dallas* (2008) 165 Cal.App.4th 940, 953.) Family Code section 6211 defines domestic violence, in relevant part, as "abuse perpetrated against … [¶] … [¶] … [a] cohabitant or former cohabitant, as defined in [Family Code] Section 6209." (Fam. Code, § 6211, subd. (b).) Family Code section 6209 defines a cohabitant as "*a person who regularly resides in the household*. 'Former cohabitant' means a person who formerly regularly resided in the household." (Fam. Code, § 6209, italics added.)

Section 1109's definitions of "cohabitant" do not require " 'serious courtship,' an 'increasingly exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1116.) Instead, the Legislature intended "the domestic violence statutes should apply to a range of dating relationships." (*Ibid.*)

Thus, a couple in an intimate relationship are cohabitants under the narrow definition in section 1109 and Penal Code section 13700, which is not subject to the five-year time limitation. (§ 1109, subd. (d)(3), Pen. Code, § 13700.) Platonic roommates are cohabitants under the broader definition in the Family Code that applies to nonintimate household members, but that evidence is subject to the five-year limitation. (§ 1109, subd. (d)(3); Fam. Code, §§ 6211, subd. (b), 6209.)

G.     *Analysis*

As explained above, section 1109 defined "cohabitant" by reference to both Penal Code section 13700 and Family Code section 6211. Defendant relies on cases interpreting Penal Code section 275.5, willful infliction of corporal injury, to argue she was not within the definition of a cohabitant.

22.

These cases, however, solely rely on the definition of a cohabitant stated in Penal Code section 11370. In *People v. Holifield* (1988) 205 Cal.App.3d 993, the court addressed a conviction for violating section 273.5, willful infliction of corporal injury, and held the word "cohabiting" under that statute could be defined by reference to the definition of "cohabitant" in Penal Code section 13700. (*Id*. at pp. 998–999.) *Holifield* rejected the defendant's argument that "cohabiting" meant a quasi-marital relationship but held that Penal Code section 273.5's definition "requires something more than a platonic, rooming-house arrangement," and instead requires "a 'significant relationship' by analogy to the domestic violence act provisions." (*Id*. at p. 999; *ibid*.) *Holifield* concluded that "cohabiting" under section 273.5 "means an unrelated man and woman living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy. That definition accords with the common, broad understanding of 'cohabiting' except for the limitation, implied from the man-woman restriction on the face of the statute, that the couple must be unrelated and living in sexual or amorous intimacy. This definition gives sufficiently definite warning to the offender and guidelines for law enforcement to satisfy the state and federal Constitutions." (*Id*. at p. 1000.)

It has thus been held that "[f]or purposes of Penal Code section 273.5, which defines the crime of inflicting corporal injury on a cohabitant, 'cohabitants' have been defined as 'those " 'living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy.' " [Citation.]' [Citations.] We may assume, without deciding, that 'cohabitant' has the same meaning in Penal Code section 13700." (*People v. Dallas*, *supra*, 165 Cal.App.4th at pp. 952–953.)

Defendant relies on these definitions to argue she was not a "cohabitant" with Osorio because there was no evidence that they had a substantial, permanent relationship with involving sexual intimacy. The trial court relied on *Holifield* when it found defendant and Osorio were cohabitants, and the evidence supports the trial court's finding

23.

under the definition in Penal Code section 13700.  Ms. Bautista, who lived in the house in front of the trailer, believed defendant had been living with Osorio for about one month and she regularly saw them together.  Ms. Lopez, Osorio's niece, regularly visited the trailer, saw them together, and believed defendant and Osorio had been living together for about three months.  Defendant told the detectives that she had lived in the trailer with Osorio for two months.  She never said that she planned to leave defendant and move out of the trailer, and instead claimed she was going to look for a job to contribute to their living expenses.  She admitted that she engaged in sexual relations with Osorio.  While defendant told the detectives that she was not romantically attracted to Osorio and did not want to have sex with him, she never testified that Osorio used force or threats to engage in sexual relations.  During her interview with the detectives, when she wrote a letter to Osorio, she wrote that she loved him even though they had their differences.  She turned him down to have sex because she did not find him sexually attractive, and she "gave [him] some action because [she] did enjoy [his] company."  The evidence supports the court's finding that their sexual contact, "though infrequent, and the victim's romantic feelings for the defendant, though unreturned, show an intimacy going well beyond ordinary roommates."

We further find that even if defendant's insistence that she did not have an intimate relationship with Osorio was accepted, the trial court's finding that they were cohabitants was also correct under section 1109's alternate definition in Family Code section 6211, that "defines domestic violence more broadly as including abuse committed against either '[a] cohabitant or former cohabitant, as defined in Section 6209,' [citation] ….  … Family Code section 6211 expressly incorporates the following definition in Family Code section 6209:  ' "Cohabitant" means a person who regularly resides in the household.' " (*People v. Dallas, supra*, 165 Cal.App.4th at p. 953.)

Defendant and Osorio were clearly "cohabitants" within the meaning of the broader definition in Family Code sections 6211 and 6209.  Defendant was charged with

24.

committing the murder on October 9, 2018, and her prior domestic violence convictions occurred in 2017 and 2018, within section 1109's requirement of a five-year period to rely on the Family Code definitions. As already explained, she had lived with Osorio in the trailer for two to three months. Ms. Bautista regularly saw them together. Ms. Lopez, Osorio's niece, also saw them together, and testified Osorio bought clothes and food for her, and they seemed happy. Defendant stated she had lived with him for two months, and never stated that she was planning to move out. Instead, she stated her intent to start working to contribute to their expenses. Defendant and Osorio were thus cohabitants within the meaning of Family Code sections 6211 and 6209.[7]

### H.      *Relevance and Prejudice*

Defendant next argues her three prior convictions were not relevant under section 1109, and were unduly prejudicial under section 352, because they did not show an escalating pattern of abusive conduct since the prior offenses occurred 17 months before the murder, they were for "harmful touching in which no injury was inflicted," and the offenses involved a different victim.

Section 1108 is parallel provision to section 1109 and permits introduction of a defendant's prior sexual offenses as propensity evidence under certain circumstances. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024; *People v. Johnson* (2000) 77 Cal.App.4th 410, 420.) "In the context of … sections 1108 and 1109, a defendant's propensity to commit sexual offenses or domestic violence is not an extraneous factor; it is relevant to the guilt of the accused—and evidence tending to show that propensity has probative value." (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.) As to section 1108

---

[7] We note that any error in the court's reliance on Penal Code section 13700 for the definition of "cohabitant" is irrelevant because defendant and Osorio were cohabitants under the broader definition in Family Code section 6211. A decision correct in result will not be reversed even though the stated reason is wrong. (*People v. Armstrong* (1991) 232 Cal.App.3d 228, 241–242.)

evidence, "there is no requirement that the charged and uncharged offenses be so similar that evidence of the prior acts would be admissible under section 1101. If such strict similarities were required, 'section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' " (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.)

Defendant's prior domestic violence convictions occurred in 2017 and 2018, the murder occurred in October 2018, and the prior offenses were not unduly remote. (*People v. Jones* (2012) 54 Cal.4th 1, 52.) The evidence about the prior acts " 'was highly relevant and probative because it created a strong inference that [the defendant] had a propensity to commit' " the currently charged offense against the victim. (*Kerley, supra*, 23 Cal.App.5th at p. 536.)

"The potential for prejudice is decreased … when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) The evidence introduced at trial about defendant's prior domestic violence offenses was far less inflammatory than the evidence in support of the murder charge. The prosecution agreed to stipulate to the existence of the offenses, and the jury did not hear any details about those offenses except for the important fact that Osorio was not the victim of the prior offenses. (*People v. Rhoades* (2019) 8 Cal.5th 393, 413; *People v. Jones*, *supra,* 54 Cal.4th at p. 51.)

In addition, the jury was advised that defendant was *convicted* of the prior offenses. "[T]he prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred." (*People v. Tran, supra*, 51 Cal.4th at p. 1047.)

Finally, the court properly instructed the jury on the consideration of the evidence, and the language in CALCRIM No. 852 has been found constitutional to instruct the jury on the consideration of section 1109 evidence. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012; *People v. Johnson* (2008) 164 Cal.App.4th 731, 739–740; *People v. Reyes* (2008) 160 Cal.App.4th 246, 251–252.)

## II. The Court's Denial of Defendant's Motion to Admit Osorio's Prior Convictions

Defendant next claims the court improperly denied her motion to admit evidence of Osorio's prior convictions pursuant to section 1103, that such evidence was admissible to support a self-defense theory in a murder case, and the exclusion of the evidence violated her due process right to present a defense because the court "improperly tailored the evidence" to her detriment since it admitted her prior domestic violence convictions.

### A. *Section 1103*

As with section 1109, section 1103, subdivision (a)(1) provides another exception to section 1101, subdivision (a), and permits the defendant to offer evidence regarding the character or trait of a victim to prove conduct of the victim in conformity with the character or trait of character. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827.) Section 1103, subdivision (a) states in relevant part:

> "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is:

> "(1) *Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character.*

> "(2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)." (Italics added.)

If the victim's violent character " 'was known to the defendant, the evidence tends to show the defendant's apprehension of danger; if it was not known, the evidence

nevertheless tends to show that the victim was probably the aggressor.' " (*People v. DelRio* (2020) 54 Cal.App.5th 47, 55–56 (*DelRio*).)

A defendant's motion to introduce evidence about the victim under section 1103 is still subject to exclusion under section 352, and the court's determination under both statutes is reviewed for an abuse of discretion. (*People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 827–828.)

We now turn to defendant's motion and Osorio's prior convictions.

## B. *Defendant's Motion*

As explained above, the court held a hearing and granted the prosecution's motion to introduce defendant's prior domestic violence convictions under section 1109. After the court's ruling, defense counsel then made an oral motion to introduce Osorio's prior convictions: two violations of Penal Code section 273.5, willful infliction of corporal injury resulting in a traumatic condition, in 1991 and 1998; and violation of Penal Code section 417, subdivision (a), brandishing, in 1995.

Defense counsel argued the prior convictions were admissible under section 1103, subdivision (a)(1) to prove Osorio's conduct "in conformity with the trait of his character, which would [be] a trait for violence, which could be showed by prior specific instances of conduct under that statute." Counsel argued the evidence was highly relevant to support defendant's theories of both perfect and imperfect self-defense because "[Osorio] has these prior acts of violence, especially given that we really only have one eyewitness to just the beginning of what was happening between Mr. Osorio and [defendant]."

Defense counsel acknowledged the most recent of Osorio's convictions occurred 20 years ago, "but they did occur over a span of seven years, indicating some type of pattern, even though there weren't convictions after that, and given their probative nature, I believe that that would outweigh any prejudice effect to [the People's] case … despite the age."

28.

The prosecutor objected because the victim's prior convictions were too remote, and 20 years was "a pretty big break" between the prior convictions and defendant's alleged need for self-defense to show Osorio's propensity at the time of the murder in October 2018.

## C. *The Court's Ruling*

The court asked the prosecutor and defense counsel if they had any information or evidence about the underlying facts of Osorio's prior convictions. Both parties agreed they were unable to find any evidence, and there was no evidence defendant was the victim. Defense counsel stated that only the dockets for the convictions were available, and the prosecutor agreed all the other documents had been destroyed.

The court acknowledged Osorio's prior convictions might be relevant under section 1103 as to defendant's self-defense theories, but the convictions occurred 20 to 30 years earlier, and there was no evidence or information about the nature of the offenses that might show a pattern of conduct.

The court denied defendant's motion to admit such evidence but stated that it would reconsider if the parties obtained information about the underlying facts of Osorio's prior convictions. The parties did not produce additional evidence, and Osorio's prior convictions were not introduced.

## D. *Analysis*

Defendant argues that Osorio's prior convictions were relevant and admissible under section 1103 to rebut the prosecutor's claims that she fabricated her self-defense claims that she feared Osorio.

### 1. Closing Argument

In challenging the court's ruling under section 1103, defendant asserts for the first time on appeal that the prosecutor improperly asserted in closing argument that Osorio " 'probably thought it was okay to make a move on [defendant]' " because she had consented in the past. [The prosecutor's closing] argument is of course an outdated trope

29.

that has been removed from the law. Even if a person initially consents to intercourse, if that person withdraws the consent but the partner ignores the withdrawal and persists, that conduct is rape. (*In re John Z.* (2003) 29 Cal.4th 756, 762–763.)"

We note that defendant has forfeited any contentions based on prosecutorial misconduct because she did not object to the prosecutor's closing argument, and she has not raised a misconduct claim in this appeal. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) There is nothing in the record to indicate that an objection would have been futile, and the prosecutor's argument was not so extreme or pervasive that a prompt objection and admonition would not have cured the harm. (*Ibid.*)

As for *John Z.*, the California Supreme Court addressed in that case "whether the crime of forcible rape [citation] is committed if the female victim consents to an initial penetration by her male companion, *and then withdraws her consent during an act of intercourse, but the male continues against her will*," and held "that a withdrawal of consent effectively nullifies any earlier consent and subjects the male to forcible rape charges *if he persists in what has become nonconsensual intercourse*." (*In re John Z., supra*, 29 Cal.4th at p. 757, italics added; *id*. at p. 758, italics added.) *John Z.* held that even assuming the victim in that case "initially consented to, or appeared to consent to, intercourse with defendant, substantial evidence shows that she withdrew her consent *and, through her actions and words, communicated that fact to defendant*" at the time of the acts. (*Id*. at p. 762, italics added.)

Even if defendant had preserved this issue for review, the prosecutor's closing argument cited on appeal, when quoted in its entirety, did not run afoul of *John Z.* The prosecutor addressed defendant's statements to the detectives, that she didn't want a romantic relationship with Osorio, and argued there was evidence that they had a good relationship. The prosecutor played a portion of defendant's pretrial interview, where she stated Osorio performed an act of sodomy on her the prior night and she had previously given him permission to do that act. The prosecutor then argued: "And there you have it.

30.

The detectives defined what consensual was, and she said, 'Yeah, it was probably consensual.' [Osorio] probably thought it was okay to make a move on her. Is that what she wanted? No. *But she never communicated that to him*." (Italics added.) The prosecutor's argument was thus consistent with *John Z.*, that defendant told the detectives she had previously given Osorio permission to perform the sexual act, and admitted that she did not withdraw permission.

### 2. DelRio

Next, defendant relies on *People v. DelRio, supra,* 54 Cal.App.5th 47, and argues the court abused its discretion to exclude Osorio's prior convictions. In *DelRio*, the defendant and the victim were two men involved in a shootout with each other. The defendant killed the victim and was charged with murder. (*Id*. at pp. 48–49.) The trial court excluded evidence of three instances of the victim's past domestic violence on the ground the defendant did not know about them so they could not have influenced his actions. (*Id.* at pp. 54–55.)

*DelRio* reversed the defendant's conviction and held the trial court's analysis was incorrect as a matter of law because the defendant's knowledge of the victim's past acts was not relevant to the question of whether the victim acted violently at the scene. (*DelRio, supra*, 54 Cal.App.5th at pp. 55–56.) *DelRio* held that where the defendant's theory of the case is that the victim's "violent character was circumstantial evidence of how [the victim] acted at the scene," the defendant need not show he was aware of the victim's prior violent conduct. (*Id*. at p. 55.)

*DelRio* rejected the People's argument that the evidence was properly excluded since it was prejudicial under section 352. *DelRio* held the evidence the victim was by nature violently aggressive was potentially highly probative since both men had loaded guns, both fired at each other, and there were no independent witnesses to corroborate or refute the defendant's testimony that the victim drew his gun first, leaving the defendant in fear of his life. (*DelRio, supra*, 54 Cal.App.5th at pp. 49–50, 56–57.)

*DelRio* concluded the court's exclusion of the evidence was not harmless in "this close case" because "[t]he only eyewitness testified to classic self-defense: [the defendant] shot after [the victim] aggressively racked and aimed a semiautomatic at [the defendant]. [The defendant's] testimony was self-serving but fit all physical evidence. The witnesses who heard shots were nearly useless, for none knew whether [the victim or the defendant] first raised a gun. No evidence suggested [the defendant] had a motive to shoot [the victim]. [The defendant] did show consciousness of guilt, but his testimony portrayed him as a dealer in illegal drugs, as a convicted felon who knew he could not legally carry a gun, and as one scared of the law—and his mother's judgment should she learn the truth. [The defendant] had reasons besides murder to feel guilt." (*DelRio, supra*, 54 Cal.App.5th at p. 57.)

Defendant's reliance on *DelRio* is misplaced because the trial court's decision to exclude the evidence in this case was not based on whether or not defendant knew of Osorio's prior convictions. Instead, the court acknowledged Osorio's prior convictions could be relevant and probative in this case but excluded the evidence because both parties admitted there were no surviving records to establish the facts surrounding these convictions, and the offenses occurred over 20 years before the murder.

### 3.    The Remoteness of the Prior Convictions

Defendant asserts the probative value of Osorio's prior convictions was not diminished by their remoteness. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284.) "Remoteness of prior offenses relates to 'the question of predisposition to commit the charged sexual offenses.' [Citation.] In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses. However … significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' [Citation.] Put differently, if the prior offenses are very similar in nature to

the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*Id*. at p. 285.)

In this case, however, the court was unable to make this determination because of the absence of any evidence or information about the factual basis that resulted in Osorio's convictions that occurred as long as 27 years before the murder: in 1991 and 1998 for violating Penal Code section 273.5, willful infliction of corporal injury resulting in a traumatic condition; and in 1995 for violating of Penal Code section 417, subdivision (a), brandishing.[8]

In evaluating the probative value of evidence under section 352, the focus is on the underlying facts of the prior and current offenses to determine whether the evidence should be admitted even if remote and far removed from the current offense. In *People v. Harris* (1998) 60 Cal.App.4th 727, the defendant was charged with using a position of trust as a mental health nurse to engage in sex with two women who were "vulnerable due to their mental condition." (*Id*. at pp. 730–732.) The prior offense involved a brutal rape where the defendant beat and stabbed the victim. (*Id.* at p. 733.) *Harris* held the prior offense was improperly admitted at trial because there were striking dissimilarities between the 23-year-old prior offense and the charged offenses and concluded that the prior offense had no "significant probative value" on any disputed issue. (*Id.* at pp. 740–741.)

In contrast, in *People v. Branch, supra*, 91 Cal.App.4th 274, the defendant was charged and convicted of committing a lewd and lascivious act upon a child under the age of 14 and using a foreign object to penetrate the genital opening of a child under the

---

[8] Given the absence of the records of the prior convictions, defendant was also unable to clarify which subdivision of Penal Code section 417 was violated by Osorio in 1995, because section 417, subdivision (a) defined two offenses at that time: (1) brandishing any deadly weapon; and (2) brandishing a firearm, whether loaded or unloaded. (See § 417 Historical Notes; Stats. 1993, Ch. 1098, § 6.5 (A.B. 1268).)

age of 14, who was more than 10 years younger than the perpetrator. The trial court admitted evidence that the defendant committed "a series of uncharged prior sexual offenses committed more than 30 years prior" to the charged crimes. (*Id*. at p. 277.) On appeal, the defendant argued admission of the prior acts was prejudicial because the incidents occurred 30 years before the charged offenses. *Branch* rejected the defendant's argument and held the prior and the current offenses committed by the defendant "were remarkably similar. As noted by the trial court, [the defendant] first molested a 12-year-old stepdaughter [in the prior uncharged acts], then a 12-year-old step-great-granddaughter [in the charged offenses]. Moreover, [the defendant] took advantage of the fact that each victim was staying in his home when the molestations took place [in the prior and charged offenses]. Further, in an evident attempt to shield himself from being found out, he lied and told each victim's principal female caretaker that the victim had recently done something wrong. In sum, the substantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses." (*Id*. at p. 285.)

In this case, such an analysis was impossible since the parties agreed the records no longer existed to disclose any underlying facts or even the identity of the victims of Osorio's convictions in 1991, 1995, and 1998. Thus, we cannot say the court abused its discretion when it denied defendant's motion to admit Osorio's prior convictions.

Defendant argues the court's reliance on the absence of underlying facts to exclude Osorio's prior convictions was invalid because the court had already "allowed [defendant's] priors to be introduced without inquiring into the circumstances of those cases." As explained in issue 1, however, the prosecution's motion to introduce defendant's prior domestic violence convictions included a factual summary of those offenses, which had occurred within two years of the murder. Defendant never objected to the accuracy of that summary, and the court conducted an analysis pursuant to section 352 when it admitted that evidence.

### 4. Prejudice

Defendant argues the court's exclusion of Osorio's prior convictions was prejudicial and violated her due process right to present her self-defense theories at trial. It is well settled, however, that application of the ordinary rules of evidence does not implicate due process and is reviewed under the prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

Even assuming the court erroneously excluded Osorio's prior convictions, any error was harmless because it would not have resulted in a more favorable verdict, and the court's ruling did not prevent defendant from introducing evidence of her defense theories of justifiable homicide based on self-defense, and manslaughter based on imperfect self-defense. The jury heard defendant's pretrial interview with the detectives, where she said Osorio talked about being her boyfriend but she was not interested; Osorio told defendant that she should take care of him, and he would take care of her; Osorio repeatedly attempted to have a sexual relationship with her nearly every day, but she refused and told him to stop; Osorio would get angry and call her names; and her account of what happened the night before the murder when Osorio tried "to come on to [her]," and hit her in the arm; defendant said he always pressured her for sex; and she woke up to discover Osorio was sodomizing her. Defendant stated when Osorio and his friend arrived at the trailer that afternoon, he "reeked" of alcohol and looked at her like he wanted to have sex, she told him not to touch her, Osorio "started wrestling" and "using force" against her, she threw him to the ground, and then she started hitting him with the pipe because she feared for her life and that he would sodomize her again. The jury also heard supporting testimony from Ms. Bautista, that she saw defendant and Osorio arguing

35.

once, defendant was yelling at him, and on two or three occasions, defendant complained about Osorio and said "he would touch her" sexually, and she did not like that.

While the jury heard evidence that supported defendant's self-defense theories, it also heard defendant's admissions during the pretrial interview that when Osorio returned to the trailer, she "lost control," she was "[a] little bit" angry, she hit him in the head and body at least ten times with the metal pole, Osorio was bleeding from his head and making gurgling sounds, and she kept hitting him until he stopped moving and then fled the scene. The jury also heard testimony from Ferrer, who did not previously know either Osorio or defendant, and described how defendant was waiting outside the trailer when he arrived in the yard with Osorio, she already had the metal bar near her, she was upset, Osorio and defendant began arguing and pushing each other, Osorio "backed off," defendant hit the top of Osorio's head with the metal bar, and she split his head open.

Based on the record before this court, there is no reasonable probability that defendant would have obtained a more favorable outcome had he been permitted to introduce evidence of Osorio's prior convictions. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 828.)

## DISPOSITION

The judgment is affirmed.